## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA
_____

Emmett Perkerson,                                   Civ. No. 11-1709 (PJS/JJK)

       Plaintiff,

v.
                            **REPORT AND**
Michael J. Astrue, Commissioner     **RECOMMENDATION**
of Social Security,

       Defendant.
_____

Andrew W. Kinney, Esq., and Jennifer G. Mrozik, Esq., Hoglund, Chwialkowski & Mrozik, PLLC, counsel for Plaintiff.

David W. Fuller, Assistant United States Attorney, counsel for Defendant.
_____

JEFFERY J. KEYES, United States Magistrate Judge

     Pursuant to 42 U.S.C. § 405(g), Plaintiff Emmett Perkerson seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"), who denied Plaintiff's application for disability insurance benefits and supplemental security income.  The parties have filed cross-motions for summary judgment.  (Doc. Nos. 8, 14.)  This matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. Loc. R. 72.1.  For the reasons stated below, this Court recommends that Plaintiff's motion be **DENIED** and that Defendant's motion be **GRANTED**.

**BACKGROUND**

**I.      Procedural History**

Plaintiff filed applications for disability insurance benefits ("DIB") and

supplemental security income ("SSI") on September 7 and 18, 2007,

respectively, alleging a disability onset date of June 15, 2007.  (Tr. 142, 144,

152.)[1]  The applications were denied initially and on reconsideration.  (Tr. 61, 72.)

Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ")

on May 28, 2008.  (Tr. 79.)  The ALJ conducted a hearing on November 13,

2009, and issued an unfavorable decision on Plaintiff's application on

December 7, 2009.  (Tr. 7, 25.)  Plaintiff sought review of the ALJ's decision, but

the Appeals Council denied Plaintiff's request for review on April 27, 2011.

(Tr. 1.)  This denial of review made the ALJ's December 7, 2009, decision the

final decision of the Commissioner.  *See* 20 C.F.R. §§ 404.981, 416.1481.

On June 28, 2011, Plaintiff filed the instant action, seeking judicial review

of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  (Doc. No. 1.)

On August 22, 2011, Defendant filed an Answer along with a certified copy of the

Administrative Record.  (Doc. Nos. 6, 7.)  The parties then cross-moved for

summary judgment as provided in Local Rule 7.2.  (Doc. Nos. 8, 14.)

---

[1]      Throughout this Report and Recommendation, reference to the
Administrative Record (Doc. No. 7) for this case is made by using the
abbreviation "Tr."

## II.    Background

Plaintiff was born on April 4, 1956, and he was fifty-one years old at the time of his alleged onset of disability.  (*See* Tr. 152.)  He has said both that he completed the eleventh grade and received his GED, and that he is a high school graduate.  (Tr. 32, 512.)  After high school, he worked as a welder from 1975 to 1978.  (Tr. 172.)  He began welding on aircraft carriers and other military ships for the Newport News Shipyard and Dry Dock Company in Virginia.  (Tr. 33, 34.)  And as a welder, Plainitiff would have to move a seventy to eighty pound "MIG box" to different areas on the ship.  (Tr. 34.)

Plaintiff enrolled in the U.S. Navy and worked as a machinist through 1979.  (Tr. 172.)  He reports that he initially injured his back while in service.  (Tr. 500, 510.)  Specifically, Plaintiff said that he threw his duffle bag over his shoulder while moving barracks in 1978 or 1979 and "felt a pop" in his back.  (Tr. 438, 444, 475.)  He said he had a sudden onset of back pain and was hospitalized for at least six days.  (*Id.*)[2]

In 1980, after the Navy, Plaintiff returned to welding.  (Tr. 172.)  In 1992, he also worked as a subcontractor and continued to do so until 2007.  (Tr. 161, 172.)  Between 1992 and 2002, and once again in 2005, he worked for temp agencies as an assembly laborer.  (Tr. 161.)  He would work these jobs for three

---

[2]    He later said he was hospitalized for around two weeks in Waukegan, Illinois.  (Tr. 39.)  And at one point, Plaintiff could not recall the specific incident during which he initially injured his back.  (Tr. 500.)

to six months at a time.  (Tr. 35.)  At one point, he worked for Honeywell on an assembly line, which required him to sit and stand.  (Tr. 34, 46–47.)  And for three years in the late 1990s, he did construction work—hanging drywall, installing vinyl siding, and working on decks.  (Tr. 35, 46.)

In the summer of 2007, Plaintiff was working on a military ship in Charleston, South Carolina.  (Tr. 39, 249.)  While there, he and his wife were homeless, living in a car and on the streets.  (Tr. 320.)  During this job, Plaintiff began having more problems with back and neck pain.  (Tr. 39.)  He said his supervisor would send him home early because the supervisor could see how much pain he was in.  (*Id.*)  On June 15, 2007, Plaintiff's alleged disability-onset date, Plaintiff stopped working altogether because of his pain.  (Tr. 160.)[3]

## III.   Testimony at the Administrative Hearing

### Plaintiff's Testimony

A hearing was held before Administrative Law Judge ("ALJ") Karen Sayon in Orland Park, Illinois, on November 13, 2009.  (Tr. 25.)  Plaintiff appeared via video conferencing from Gary, Indiana.  (Tr. 27.)  During the hearing, he told the ALJ that he had not worked since June 2007 and that his only income was through general assistance benefits from Minneapolis and food stamps.  (Tr. 32–33.)  He testified that he was living with his son, niece, and sisters in Minneapolis because he could not work or afford a residence of his own.  (Tr. 32.)  He also

---

[3]     A detailed history of Plaintiff's medical treatment after the disability onset date is set forth in the Appendix to this report.

stated that he did not have money to pay fines for two speeding tickets and to get his Minnesota driver's license back.  (*Id.*)  He testified that after he stopped working in 2007, he did not receive worker's compensation or unemployment benefits.  (Tr. 33.)  He stated that he spent his time watching TV and playing with his grandchildren.  (Tr. 42.)

Plaintiff also testified about his health conditions at the time of the hearing. (Tr. 36.)  He stated that chest pains were still a problem but that he was not on any medication for heart problems.  (*Id.*)  He said he would have chest pains about once every three months and that he had gotten them one week prior to the hearing.  (*Id.*)  Also, about once a month, Plaintiff would be unable to wear a shoe because of gout in his foot.  (Tr. 45.)  He testified that his biggest problem, though, and the only thing that kept him from working, was his neck and back pain.  (Tr. 36–37, 40.)

Plaintiff testified that he originally injured his back in 1979, adding that it had become more problematic recently.  (Tr. 37.)  He stated that he had constant pain, mostly in his lower back and at the base of his neck.  (*Id.*)  His neck pain, which did not radiate, started around the same time as his back pain.  (Tr. 38– 39.)  He rated his typical back pain at an eight out of ten.  (Tr. 37.)  He said that at times he had to keep adjusting and moving to find relief and that the most relief came when he would lie down in bed with his knees up and his feet flat. (Tr. 38.)  But the pain was "always continuously there, always," he said, and he would have to cancel plans about twice a week because of pain.  (Tr. 41, 44.)

Plaintiff added that sometimes when he walked or stood his right leg would get numb or hurt. (Tr. 37.) He told the ALJ that he could walk three to four blocks before he started "feeling it" in his legs and would have to sit down after each time he walked to relieve pain. (Tr. 37, 43.) He stated that he could not walk again or stand for twenty-five minutes until he had first sat for at least thirty minutes, sometimes an hour. (Tr. 43–44.) He also said he had trouble sleeping at night and would only get six hours of sleep on average. (Tr. 37.) He claimed that almost every other day he would have to lie down for one to two hours because of sleepless nights. (Tr. 42.) He said he was avoiding lifting anything over ten pounds, and when he tried to move heavier items, such as mattresses or couches, he "really pa[id] for it" that night. (Tr. 40.) He also said he could sit for twenty-five minutes before having to get up and could stand in place for twenty-five to thirty minutes. (Tr. 41.)

As for medications, Plaintiff testified that he was taking some to control his pain. (Tr. 37.) He stated that he had taken Vicodin first, but then switched to Percocet and Oxycodone because Vicodin upset his stomach. (Tr. 39.) He said injections helped relieve his pain after five to seven days, but the relief did not last long. (Tr. 38.) And he said he never received or got to use a TENS unit. (*Id.*) He also said that he was not doing physical therapy but that he would stretch and do exercises on his bed that helped relieve pain. (Tr. 39–40.) In addition, Plaintiff testified that Dr. Michael Wengler of the Tria Orthopaedic

6

Center, who was treating him for back pain, did not recommend back surgery because doing so would only shift pressure to another part of his back.  (Tr. 43.)

### Vocational Expert Testimony

Vocational expert Thomas Presick also testified at the administrative hearing.  (Tr. 45.)  He testified that there were no skills from Plaintiff's past work as a welder, carpenter, or small parts assembler that could transfer to other light or sedentary jobs.  (Tr. 48.)  The ALJ then asked Presick the following hypothetical:

> [L]et's assume an individual of the same age as Mr. Perkerson.  He told us that he's 53 years old and he is a high school graduate.  He has the work history that you just described for us.  Let's first assume that he's limited to, to light work.  Work which involves lifting and carrying up to 10 pounds frequently, 20 pounds occasionally.  Standing and walking about six out of eight hours in a work day.  The other times at sitting.  He also should be limited to no climbing of ladders, ropes or scaffolding, as well as occasional stooping.  Given those limitations, would his past work be available?

(*Id.*)  Presick responded that no such work would be available.  (*Id.*)  The ALJ also asked Presick whether there were other jobs in the economy with the above limitations, and Presick testified that there were other jobs that fit those limitations (i.e., light unskilled) in the relevant region – Chicago, Carroll counties, and northwest Indiana region.  (*Id.*)  Specifically, he explained that there were 6,000 small parts assemblers jobs, 8,000 production assembler jobs, and 1,000 electronics worker jobs all within the region and with light physical demand.  (Tr. 48–49.)

If the hypothetical also included a sit/stand option allowing the individual to change positions every hour or at will, Presick testified that there were 4,000 production assembler jobs, 3,000 small parts assembler jobs, and 500 electronics workers jobs in the region. (Tr. 49, 50.) Employers would not tolerate it, however, if the person needed to lie down for two hours twice during the work week. (Tr. 49.) Nor would they tolerate an employee having to miss one day of work per week because of pain symptoms. (Tr. 50.) Presick testified that, at most, a non-collective bargaining position would allow an individual to miss one half day per month or six days per year because of pain, and a collective bargaining position would allow one day per month or twelve days per year. (*Id.*)

## IV.    The ALJ's Findings and Decision

In her decision dated December 7, 2009, the ALJ found that Plaintiff was not disabled as defined by the Social Security Act and denied Plaintiff's application for DIB and SSI. (Tr. 19.) The ALJ followed the five-step procedure as set out in the Code of Federal Regulations. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The Eighth Circuit Court of Appeals has summarized these steps as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education and work experience)"; (4) "whether

the claimant has the residual functional capacity ["RFC"] to perform his or her past relevant work"; and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work then the burden is on the Commissioner "to prove that there are other jobs in the national economy that the claimant can perform." *Fines v. Apfel*, 149 F.3d 893, 894–95 (8th Cir. 1998).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of June 15, 2007, therefore meeting the requirement at the first step of the disability-determination procedure.  (Tr. 12.)  At step two, the ALJ found that Plaintiff had the following severe impairments: "mild degenerative disc disease of the lumbar and cervical spine, and gout."  (*Id.*)  The ALJ concluded that Plaintiff's depression, enlarged thyroid, high blood pressure, and substance abuse were non-severe because none "cause[d] more than minimal limitations in [his] ability to perform basic work activities . . . ."  (Tr. 12–14.)

At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 14.)  Specifically, the ALJ stated that "the medical evidence does not document listing level severity and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment, either individually or in combination."  (*Id.*)  She added that Plaintiff's attorney also had conceded that Plaintiff did not meet or equal a listing.  (*Id.*)

9

The ALJ found that Plaintiff had the RFC to perform "light work as defined in 20 CFR 404.1567(b) and 416.967(b)." (*Id.*)  Specifically, she stated that he could lift or carry up to twenty pounds occasionally and ten pounds frequently, stand or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour work day, but that he could not climb ladders, ropes, or scaffolds, and could only occasionally stoop.  (*Id.*)  The ALJ made these findings after considering all of Plaintiff's symptoms and reviewing testimony from the hearing.  (*Id.*)  She concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible to the extent that they are inconsistent with the above residual function capacity assessment."  (Tr. 15.)  Further, she stated that Plaintiff's back pain had "remained unchanged" and was "more manageable than alleged," his treatment for gout was "limited and conservative," he had not always complied with treatment, and some doctors had opined that he was capable of working.  (Tr. 15–17.)

At step four, the ALJ adopted the vocational expert's conclusion and found that Plaintiff was unable to perform any past relevant work.  (Tr. 17.)  And at step five, the ALJ found that based on the vocational expert's testimony there are jobs that exist in significant numbers in the national economy that Plaintiff can still perform in light of his age, education, work experience, and RFC.  (Tr. 18.)  Thus, she ultimately concluded that a finding of "not disabled" was appropriate.  (*Id.*)

10

**DISCUSSION**

**I.    Standard of Review**

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006).  "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as a whole.'"  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987) (quotation omitted).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

11

(quotations omitted); *see also Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001) (quoting *Beckely v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998)). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." *Gavin*, 811 F.2d at 1199. "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Id*. In reviewing the administrative decision, "'[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" *Id*. (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act. *See* 20 C.F.R. § 404.1512(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928

F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second, that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

## II.   Analysis of the ALJ's Decision

Plaintiff argues that, contrary to the ALJ's conclusion, he was disabled during the period between June 15, 2007, his alleged disability onset date, and December 7, 2009, his hearing date.  (Doc. No. 9, Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") 7.)  In support, he primarily relies on Dr. Wengler's opinion that he was "*at least* limited to sedentary work" by September 17, 2009, and that at that time "even sedentary work would be quite painful because of the facet arthropathy at L5-S1." (*Id.* (quotations omitted).)  He argues that the ALJ failed to properly evaluate Dr. Wengler's medical opinion under the criteria found in 20 C.F.R. § 404.1527(d) and that the ALJ should have given the opinion more weight because Dr. Wengler examined Plaintiff more than other physicians and Dr. Wengler reviewed both the 2007 MRIs and more recent imaging.  (*Id.* at 8, 9.) According to Plaintiff, Dr. Wengler's opinion clearly stated why his back problems limited his work, was consistent with that of Dr. Elizabeth Fazendin of the Minneapolis VAMC, and was more "informed by objective clinical findings" than others.  (*Id.* at 7, 9–10.)

13

Defendant, on the other hand, argues that the ALJ's decision to deny Plaintiff benefits was supported by substantial evidence.  (Doc. No. 15, Def.'s Mem. in Supp. of its Mot. for Summ. J. ("Def.'s Mem.") 1.)  He asserts that the ALJ correctly gave Dr. Wengler's opinion "little weight" because it was inconsistent with the doctor's own treatment notes and the overall evidence. (*Id.* at 6.)  Defendant asserts that the record shows there were no abnormalities or changes in Plaintiff's back pain and that Dr. Wengler himself said Plaintiff's lower back and range of motion were "normal."  (*Id.* at 7.)  In addition, Defendant asserts that the opinions of Dr. David Griffin of the Minneapolis VAMC, Dr. Cliff M. Phibbs, who completed Plaintiff's state agency physical consultant advice form on November 11, 2007, and Dr. William Paule, who completed Plaintiff's physical residual functional capacity assessment on April 8, 2008, conflict with Dr. Wengler's because Dr. Griffin found that Plaintiff's condition did not preclude him from working so long as he avoided "heavy lifting," and Drs. Phibbs and Paule found that Plaintiff was able to perform a limited range of medium work. (*Id.* at 8.)  Finally, according to Defendant, Dr. Wengler's opinion was undercut by Plaintiff's noncompliance with treatment.  (*Id.* at 7.)  Defendant argues that this evidence, along with the suggestion that Plaintiff had exaggerated responses to pain, supported the ALJ's finding that Plaintiff may not be as limited as he asserts.  (*Id.* at 8.)

This Court concludes that the ALJ's decision to grant less weight to Dr. Wengler's opinion is supported by substantial evidence in the record as a

14

whole.  A treating physician's opinion is typically entitled to controlling weight
when it is "'well-supported by medically acceptable clinical and laboratory and
diagnostic techniques'" and not inconsistent with other substantial evidence in
the record.  *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007) (quoting
*Prosch v. Apfel*, 201 F.3d 1010, 1012–13 (8th Cir. 2000) (quoting 20 C.F.R.
§ 404.1527(d)(2))).  But "[a]n ALJ may discount such an opinion if other medical
assessments are supported by superior medical evidence, or if the treating
physician has offered inconsistent opinions."  *Holmstrom v. Massanari*, 270 F.3d
715, 720 (8th Cir. 2001).  Importantly, it is the province of the ALJ, not this Court,
to weigh and resolve conflicting medical opinions provided by physicians.
*Bentley v. Shalala*, 52 F.3d 784, 785 (8th Cir. 1985) ("It is the ALJ's function to
resolve conflicts among 'the various treating and examining physicians.'"); *see
also Wilson v. Apfel*, 172 F.3d 539, 542 (8th Cir. 1999) (stating that when
considering the weight to be given to medical opinions, the entire record must be
evaluated as a whole).  However, the ALJ must "give good reasons" in her
decision for the weight she gives a treating source's opinion.  20 C.F.R.
§ 404.1527(c)(2); *Prosch*, 201 F.3d at 1013.

Here, the ALJ gave more weight to Dr. Griffin's opinion and less weight to
Dr. Wengler's for the following reasons:

> There are numerous opinions from various VA doctors commenting
> on the claimant's ability to work.  For example, Dr. Wengler imposed
> permanent restrictions on the claimant's ability to stand, lift, sit, bend
> and squat, but he did not explain the extent of such limitations. He
> also indicated [that] he agreed that [Plaintiff] would have difficulty

15

> engaging in manual labor or even sedentary work. Dr. Griffin, on the other hand, only imposed a limitation of no heavy lifting, which is consistent with the residual functional capacity I assessed above. Dr. Griffin repeated, about three months later, that the [Plaintiff] should be able to work . . . . I assign Dr. Wengler's opinion little weight as it is inconsistent with the evidence as a whole as well as his own treatment notes[,] and I assign Dr. Griffin's opinion controlling weight as it is consistent with the medical evidence as a whole.

(Tr. 17.)  Plaintiff argues that the ALJ's assessment of Dr. Wengler's opinion is "inadequate under the law" (Pl.'s Mem. 9), but he cites no case law in support of that conclusion.  Instead, he simply argues that the ALJ "failed to evaluate" Dr. Wengler's opinion under the criteria of 20 C.F.R. § 404.1527(d).  (*Id.* at 8.) And he points out that Dr. Wengler examined and treated him multiple times, reviewed his 2007 MRI, ordered new imaging studies, and gave an opinion consistent with Dr. Fazendin's.  (*Id.* at 9.)  Plaintiff's argument is flawed for three reasons.

First, the ALJ was not required to conclude that Plaintiff was disabled simply because Dr. Wengler opined that he would have difficulty performing manual labor or sedentary work.  *See* 20 C.F.R. § 404.1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.").  The ultimate determination of disability is a question for the ALJ, not the physician.  *Samons v. Astrue*, 497 F.3d 813, 819 (8th Cir. 2007) (citing *Ellis v. Barnhart*, 392 F.3d 988, 994–95 (8th Cir. 2005)).  And because the record supports the ALJ's observation that Dr. Wengler did not explain the extent of Plaintiff's limitations (*see* Tr. 463, 473),

16

she was permitted to limit the weight of his opinion.  *See Samons*, 497 F.3d at

818 ("[T]he ALJ may give a treating doctor's opinion limited weight if it provides

conclusory statements only.").  Therefore, insomuch as Plaintiff relies on

Dr. Wengler's statement that work would be "difficult" for him, his argument is

insufficient to overturn the ALJ's ultimate decision.  *See Davidson v. Astrue*, 578

F.3d 838, 842 (8th Cir. 2009) ("[A] treating physician's opinion that a claimant is

'disabled' or 'unable to work,' does not carry 'any special significance,' 20 C.F.R.

§ 416.927(e)(1), (3), because it invades the province of the Commissioner to

make the ultimate determination of disability.").

    Second, when arguing that the ALJ should have given more weight to

Dr. Wengler's opinion, Plaintiff disregards the rest of the record, which the ALJ

was required to consider when making her decision.  *See Prosch*, 201 F.3d at

1013 ("Consistent with the regulations, we have stated that a treating physician's

opinion is normally entitled to great weight, but we have also cautioned that such

an opinion does not automatically control, since the record must be evaluated as

a whole." (quotations and citations omitted)).  Like Dr. Wengler, many doctors

treated Plaintiff more than once, and almost all of them reviewed his 2007 MRI.

Dr. Griffin consulted Plaintiff twice.  (Tr. 496–99.)  And Dr. David E. Mariner of

the Minneapolis VAMC treated him five times (Tr. 243–48, 377–83, 503–08, 518–

22, 528–34), wrote two assessments (Tr. 465, 469), and noted that his MRI

showed "no significant findings or disc disease."  (Tr. 247.)

Moreover, substantial evidence in the record supports the ALJ's finding that Dr. Wengler's opinion about Plaintiff's ability to work conflicted with other physician opinions.  For example, the ALJ evaluated the RFC assessments of Drs. Phibbs and Paule, who both said Plaintiff could occasionally lift or carry fifty pounds, frequently lift or carry twenty-five pounds, and stand, walk or sit for six hours a day.  (Tr. 16–17, 339, 401.)  And she assigned these opinions some weight but gave Plaintiff the benefit of the doubt regarding his RFC by including more restrictive limitations than either of these physicians believed were warranted.  (Tr. 17.)  However, the ALJ likely recognized that these two RFC assessments alone cannot constitute substantial evidence in conflict with Dr. Wenger's because Drs. Phibbs and Paule were non-treating physicians.  *See* 20 C.F.R. § 404.1502 (defining "treating physician" as a physician or other acceptable medical source who has an "ongoing treatment relationship" with a claimant); *Lehnartz v. Barnhart*, 142 F. App'x 939, 942 (8th Cir. 2005) ("A non-treating physician's assessment does not alone constitute substantial evidence if it conflicts with the assessment of a treating physician.").  Therefore, the ALJ added that Dr. Griffin, a treating physician, gave an opinion that was consistent with the RFCs and conflicted with Dr. Wengler's opinion.  (Tr. 17.)  And the record shows that in his assessment, Dr. Griffin stated that Plaintiff could perform limited employment if he avoided heavy lifting.  (Tr. 464.)  Further, in a letter to Plaintiff's lawyer responding to an inquiry about Plaintiff's ability to work, Dr. Griffin suggested that the lawyer consult Plaintiff's medical records, including

18

Dr. Fazendin's evaluation on March 25, 2009.  (Tr. 535.)  Dr. Fazendin's

March 25, 2009, evaluation found that: (1) Plaintiff could flex his lumbar spine 40

degrees and extend 10 degrees; (2) Plaintiff gave an exaggerated pain response

to light palpitation along his entire cervical and lumbar spine, but he did have mild

paravertebral tenderness and mild sacroiliac tenderness; and (3) Plaintiff's

lumbar and cervical spine MRIs from June 2007 indicated that Plaintiff had

irritation of the left S1 nerve root related to some disk abnormality at L5-S1, that

facet hypertrophy and disk bulge at L3-4 may have been contributing to lateral

recess stenosis, and that there was no significant discogenic disease shown, but

there was occasional mild effacement of Plaintiff's anterior cerebrospinal fluid

and occasional neroforaminal stenosis.  (Tr. 501–02.)  It was Dr. Fazendin's

opinion that Plaintiff likely would always have some back pain but that she could

try to make him more functional through an active rehab program—including

physical therapy and daily exercise—which Dr. Fazendin believed would improve

Plaintiff's range of motion and function and increase his strength.   (Tr. 502.)

Thus, the opinions of Drs. Griffin, Phibbs, Paule, and Fazendin, taken together,

establish substantial evidence that Dr. Wengler's opinion regarding Plaintiff's

ability to work was inconsistent with the medical record as a whole.[4]  *See Heino*

---

[4]      Dr. Mariner, another treating physician, indicated that Plaintiff was unable
to perform any employment in the foreseeable future, but the ALJ assigned his
opinion no weight because it was unhelpful.  (Tr. 17, 466.)  There is substantial
evidence to support her decision because Dr. Mariner also wrote "unknown" next
(Footnote Continued on Next Page)

*v. Astrue*, 578 F.3d 873, 880 (quoting *Wilson*, 172 F.3d at 542) (stating that a treating physician's opinion "does not 'automatically control' in the face of other credible evidence on the record detracts from that opinion").

Finally, because controlling weight was given to a treating physician—Dr. Griffin—the ALJ did not have to consider all the factors of 20 C.F.R. § 404.1527(d) when weighing Dr. Wengler's opinion.  *See* 20 C.F.R. § 404.1527(c) ("Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion."); § 404.1527(c)(2) ("When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion.").  Thus, Plaintiff's argument that the ALJ "failed to properly evaluate Dr. Wengler's medical opinion" is without merit.

In sum, this Court concludes that there is substantial evidence in the record as a whole to support the ALJ's findings and that the ALJ did not err by refusing to give significant weight to Dr. Wengler's opinion that Plaintiff would

---

(Footnote Continued from Previous Page)
to this particular response and he had previously said he was "uncomfortable" answering when plaintiff would be able to work.  (Tr. 466, 469.)

have difficulty performing manual labor or sedentary work.[5]  This Court cannot

say, then, that the ALJ's decision that Plaintiff is not disabled under the Social

Security Act was outside her "zone of choice."  *See Bradley v. Astrue*, 528 F.3d

1113, 1115 (8th Cir. 2008).  Accordingly, this Court recommends that Plaintiff's

motion be denied, and Defendant's motion be granted.

### RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.     Plaintiff's Motion for Summary Judgment (Doc. No. 8), be **DENIED**;

2.     Defendant's Motion for Summary Judgment (Doc. No. 14), be

**GRANTED**; and

3.     The case be **DISMISSED WITH PREJUDICE**, and judgment be

entered.


Date:  June 1, 2012               __*s/ Jeffrey J. Keyes*_____
                                  JEFFREY J. KEYES
                                  United States Magistrate Judge


Under D.Minn. LR 72.2(b), any party may object to this Report and
Recommendation by filing with the Clerk of Court, and serving all parties by
**June 15, 2012**, a writing which specifically identifies those portions of this Report
to which objections are made and the basis of those objections.  Failure to

_____

[5]     Because there is substantial evidence supporting the ALJ's decision to
give less weight to Dr. Wengler's opinion and her conclusion that Plaintiff has the
RFC to perform light work, this Court need not consider Plaintiff's argument that
he is entitled to benefits if his disability onset date is amended to September 17,
2009.

comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within **fourteen days** after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.

## MEDICAL HISTORY APPENDIX

After Plaintiff stopped working in June 2007, Plaintiff went to an urgent care facility for treatment of his back and neck pain on July 9, 2007.  (*See* Tr. 324.)  On July 13, 2007, MRIs were taken of his cervical and lumbar vertebrae columns at the Ralph H. Johnson VAMC in Charleston.  (Tr. 258, 326–28.)  The cervical MRI showed an enlarged thyroid but no significant discogenic disease.  (Tr. 326–27.)  The lumbar MRI showed "irritation of the left transiting S1 nerve root related to some disc abnormality at L5/S1" and severe findings at "L3/4 where facet joint hypertrophy and disc bulge may contribute to lateral recess stenosis as described."  (Tr. 328.)

Plaintiff visited the Charleston VAMC again on July 19, 2007, and asked for stronger pain medications to help with his back.  (Tr. 324.)  He said the ibuprofen he had received when he went to urgent care on July 9, 2007, was not helping.  (*Id.*)  Plaintiff was given a letter that Dr. Robert T. McDonald had previously written.  (*Id.*)  In the letter, Dr. McDonald stated that Plaintiff's MRI indicated "some compression of nerve" in his lower back, and the doctor recommended seeing an anesthesiologist for injections.  (Tr. 323.)  Dr. McDonald also said that Plaintiff had some disc disease in his neck, but it was "not too bad." (*Id.*)  In addition, he said he would arrange an ultra sound of Plaintiff's thyroid because it was slightly enlarged.  (*Id.*)  Dr. McDonald then gave Plaintiff Naproxen to replace his ibuprofen.  (Tr. 325.)

On August 17, 2007, Plaintiff awoke at 3:00 a.m. with "sharp and stabbing" chest pain and shortness of breath.  (Tr. 263.)  He refused to let his wife call an ambulance, but after waking up again with increased shortness of breath, he decided to take the city bus to the hospital.  (*Id.*)  He was then admitted to the Charleston VAMC, where he stayed for three nights.  (*See id.*)  At the hospital, Plaintiff told a nurse that he and his wife were homeless and had been living in a car for one and one-half months.  (Tr. 320.)  He also mentioned getting in a car accident and having gone to jail on July 26, 2007.  (*Id.*)

Dr. Christian F. Reusche said Plaintiff was experiencing chest wall tenderness at that time likely related to costochondritis.[6]  (Tr. 263–64.)  Dr. Anjali R. Gopal agreed that Plaintiff's chest pain was due to costochondritis, but added that it may have been worsened by stress from Plaintiff's recent move, lack of housing, and recent release from jail.  (Tr. 313.)  During his stay, Plaintiff met with Lorenzo Moses of Chaplain Services and Judy R. Marshall, a social worker, who consulted him regarding his homelessness.  (Tr. 264, 267, 271–72.)  Mr. Moses arranged for Plaintiff and his wife to return to their family in Minnesota.  (*Id.*)

Plaintiff's chest pains and shortness of breath subsided after treatment.  (Tr. 264, 273.)  On his last day in the hospital, Plaintiff assessed his back pain as

---

[6]   Costochondritis is inflammation of the cartilage that connects a rib to the breastbone, causing pain that might mimic a heart attack.  *See* http://www.mayoclinic.com/health/costochondritis/DS00626.

a three out of ten.  (Tr. 268.)  Dr. Reusche discharged Plaintiff in good condition

with instructions to take Colchicine for his gout and Naproxen for his back pain.

(Tr. 264–65.)  Plaintiff was to follow up with his primary care provider in two

months and have a cardiac stress test taken.  (Tr. 265.)

Plaintiff then traveled to Minneapolis, where he and his wife lived in a

shelter because his sister had sold her house in which they previously lived.

(Tr. 249.)  He visited the Minneapolis VAMC for a checkup on August 30, 2007,

and reported that his back pain was at a seven out of ten.  (Tr. 251.)  Dr. Jackie

Underwood prescribed Vicodin for his pain.  (Tr. 250–51.)  She also diagnosed

him with hypertension and recommended that he quit smoking.  (Tr. 250.)

Plaintiff mentioned during this visit that he was not working and had applied for

assistance.  (Tr. 249.)  Besides his back pain and foot pain from gout, Plaintiff

reported that he felt "fairly well most days."  (Tr. 250).  And he reported no chest

pain or shortness of breath since leaving South Carolina.  (*Id.*)

On September 6, 2007, Plaintiff visited the Minneapolis VAMC again for a

follow-up visit.  (Tr. 243.)  Dr. David E. Mariner wrote that Plaintiff was upset

because of a disability form that was filled out.  (Tr. 244, 248.)  Plaintiff told

Dr. Mariner he was taking his pain medications but they only had minimal results.

(Tr. 244.)  Noting that Plaintiff's MRI showed "no significant findings or disc

disease," Dr. Mariner recommended that Plaintiff continue taking the prescribed

medications (Naproxen, Vicodin) for his back pain, along with a new pain med

(Ultram), and reemphasized that he needed to quit smoking.  (Tr. 247.)  He also

A-3

started Plaintiff on hypertension medication.  (*Id.*)  In addition, Dr. Mariner said he would order a treadmill stress test to analyze Plaintiff's history of atypical chest pain.  (*Id.*)

In a November 12, 2007 evaluation, Dr. Cliff M. Phibbs reviewed Plaintiff's back and neck problems, high blood pressure, foot gout, and enlarged thyroid. (Tr. 335–37).  Dr. Phibbs indicated that Plaintiff's symptoms were attributable to a medically determinable impairment, although the exact impairment was not specified.  (Tr. 343.)  He stated that the severity or duration of Plaintiff's symptoms was not disproportionate to expectations based on his impairments, and he concluded that Plaintiff's severity of symptoms was consistent with all the medical and non-medical evidence available.  (*Id.*)

Three days later, during the evening of November 15, 2007, Plaintiff had a sudden onset of sharp chest pain after walking three to four miles.  (Tr. 352–53.) He was taken via ambulance to the Hennepin County Medical Center (HCMC) emergency department and was admitted overnight for further evaluation.  (*Id.*) The next day, Dr. Mariam Anwar stated that Plaintiff "likely has undiagnosed coronary artery disease."  (Tr. 352.)  Dr. Anwar found "no clinical, diagnostic electrocardiographic or echocardiographic evidence for inducible ischemia." (Tr. 357.)  She then discussed a treatment plan with Plaintiff, including medications, such as aspirin and Beta blockers, and dietary and exercise recommendations.  (Tr. 352.)

Plaintiff came to the Minneapolis VAMC for a follow-up visit on November 30, 2007.  (Tr. 377.)  He complained of generalized low back pain and chronic neck pain and rated his pain intensity at an eight out of ten.  (Tr. 377, 383.)  He reported that he had "good days and bad days" and was unable to find work.  (Tr. 377.)  During a pain screening, Plaintiff said his current pain treatment was unsatisfactory and failing to meet his treatment goal.  (Tr. 383).  Dr. Mariner added Neurontin to Plaintiff's medications for his chronic pain.  (Tr. 381.)  He also placed Plaintiff on a trial of nicotine patches to help him quit smoking.  (*Id.*)  In addition, Dr. Mariner stated that Plaintiff had dyslipidemia (high cholesterol) and indicated that he would follow up with Plaintiff regarding this at their next appointment.  (Tr. 383.)

Dr. Mariner completed a medical opinion request form for Hennepin County regarding Plaintiff on December 3, 2007.  (Tr. 469.)  His diagnosis for Plaintiff included chronic pain, degenerative disc disease, osteoarthritis, hypertension, and nicotine dependence.  (*Id.*)  He stated that Plaintiff was following the treatment plan he prescribed.  (*Id.*)  On the form, Dr. Mariner indicated that Plaintiff could perform employment, limited by his knee and leg pains, but he also wrote, "I am uncomfortable answering this question.  [Plaintiff] clearly has chronic knee pains."  (*Id.*)  Thereafter, a vocational specialist was unable to make an assessment decision regarding Plaintiff because he did not show up for his appointment on December 21, 2007.  (Tr. 468.)

A-5

On March 10, 2008, Plaintiff had a scheduled appointment at the Minneapolis VAMC's Rehab Medicine Clinic, but he did not show up there either. (Tr. 424.)  However, Plaintiff called the Minneapolis VAMC on March 21, 2008, and asked for a renewal of his hydrocodone prescription, which was renewed for him.  (Tr. 423–24.)

Plaintiff came to the Minneapolis VAMC's emergency department as a walk-in on April 4, 2008.  (Tr. 416–20.)  He complained of a cough, chills, and night sweats during the previous week, in addition to constant chest pain and "pleuritic" back pain.  (Tr. 417.)  On arrival, Plaintiff rated his pain at a seven. (Tr. 416.)  Two x-rays were taken of Plaintiff's chest and interpreted by radiologist Howard J. Ansel.  (Tr. 412.)  Ansel said there was a granuloma in Plaintiff's right-middle lobe, but otherwise his chest and lungs looked normal.  (*Id.*)  Dr. Jayashri Bhaskar stated that Plaintiff's cough was related to bronchitis or sinusitis, and he prescribed doxycycline and saline spray to treat them respectively.  (Tr. 419–20.) Dr. Bhaskar said Plaintiff's troponin test was negative and that an EKG was "not concerning for cardiac etiology," and he treated Plaintiff's chest pain with Robitussin DM and Aleve (Naproxen).  (Tr. 419.)  Dr. Bhaskar also resupplied Plaintiff's Vicodin prescription and recommended that he follow up with Dr. Mariner.  (Tr. 420.)  Plaintiff was then discharged and drove himself home. (Tr. 416.)

On April 8, 2008, Dr. William Paule completed a physical residual functional capacity ("RFC") assessment, in which he evaluated Plaintiff's chest

A-6

and back pain and his gout, thyroid, and hypertension issues.  (Tr. 400–07.)
Dr. Paule listed each of Plaintiff's complaints but noted a lack of supporting
evidence for many of them.  (Tr. 401–02.)  He stated that Plaintiff's physical
exam did not note an enlarged thyroid and there was no report on his thyroid
function.  (Tr. 401.)  There was no evidence of the heart attack Plaintiff claimed
to have suffered in California, and there was no evidence or uric acid levels
noted to support Plaintiff's claim of "gout with [a] positive test for crystals."  (*Id.*)
Dr. Paule stated there was no report of a prostate exam or a prostate-specific
antigen ("PSA") test, despite Plaintiff's claims of prostate trouble.  (*Id.*)  Dr. Paule,
however, did say that Plaintiff's lumbar-spine MRI showed mild degenerative disc
disease, but no severe stenosis or herniated discs.  (Tr. 401–02.)  He also stated
that the cervical-spine MRI showed very mild lateral canal stenosis but normal
vertebrae, and on repeat review, the MRI showed a normal PSA level.  (Tr. 402.)
Dr. Paule ultimately concluded that Plaintiff's symptoms were partially credible.
(Tr. 405.)  He stated that the severity or duration of the symptoms was
disproportionate to his expectations, and he was uncertain whether the
symptoms' severity and effects were consistent with the medical and nonmedical
evidence he reviewed.  (*Id.*)

　　　Plaintiff had a scheduled appointment with Dr. Mariner at the Minneapolis
VAMC on May 6, 2008, but he did not show up.  (Tr. 414–15.)  On May 16, 2008,
the Minneapolis VAMC contacted Plaintiff via telephone, and he requested a
renewal of his Hydrocodone.  (Tr. 413.)  Dr. Mariner agreed to refill the

medication once but said he needed to see Plaintiff next time, adding that Plaintiff had missed a scheduled visit in April 2008.  (Tr. 414.)  On July 14, 2008, Plaintiff again did not show up for a scheduled appointment.  (Tr. 413.)

On December 18, 2008, Plaintiff saw Dr. Mariner for a follow-up visit at the Minneapolis VAMC.  (Tr. 528–34.)  Plaintiff stated that he had moved to Gary, Indiana, since his last visit but returned to Minnesota about one week prior. (Tr. 528.)  While in Indiana, Plaintiff and his wife of twelve years, who had been together since 1989, separated.  (Tr. 512, 516, 523, 526, 528.)  Plaintiff said his daughter, with whom he was living, and his grandchildren helped his mood. (Tr. 529.)  He reported that he had had suicidal ideations within the last week but that he would never act on them because of his family.  (*Id.*)  He also told Dr. Mariner that he had not been taking any medications "for some time" and that he had used marijuana two weeks prior, but he said he would stop using marijuana after he restarted his pain medications.  (*Id.*)  Dr. Mariner assessed that Plaintiff's hypertension was uncontrolled because he went off his meds and ordered him to restart his Lisinopril.  (Tr. 531.)  Dr. Mariner instructed Plaintiff to continue with his pain medications to treat his chronic pain from osteoarthritis and degenerative disc disease and encouraged him to quit smoking.  (*Id.*)

During that visit, Dr. Mariner also referred Plaintiff to a psychologist for an immediate mental health evaluation.  (Tr. 534.)  Plaintiff saw Dr. Douglas Olson. (Tr. 523–28.)  His chief mental health complaints were his recent separation, housing issues, lack of income, inability to work, and physical pains.  (Tr. 523–

24.)  He told Dr. Olson that for the last year he had had problems with depression, including lack of motivation, confidence, and energy, and a low mood.  (Tr. 524.)  He reported a "fleeting variety" of suicidal ideation, but no intent or planning.  (*Id.*)  Plaintiff stated that once per week he would drink about two beers and half a pint of brandy.  (*Id.*)  He recalled a lot of heavy drinking until the early 1980s and some infrequent, social use of marijuana and crack cocaine.  (*Id.*)  And he had a fifth-degree assault charge in 1986 or 1987.  (Tr. 524, 526.)  Dr. Olson noted that Plaintiff had a history of some dependence on cocaine, including six months of residential treatment sometime between 1988 and 1990.  (*Id.*)  Plaintiff stated that alcohol and drug use would be triggered by an "I don't care" attitude when things were not going well, and he would relapse when he got upset from psychological issues.  (*Id.*)  Plaintiff reported that his adult-aged, biological daughter, with whom he was living at the time, helped him with money.  (Tr. 524–25.)  Dr. Olson opined that Plaintiff may have been minimizing his drinking and that Plaintiff's history of substance use and dependence may have caused many difficulties in his life and was preventing him from improving his mental health.  (Tr. 526.)  As such, Dr. Olson found that to be a good place to begin treatment.  (*Id.*)  His diagnostic impression was that Plaintiff had an adjustment disorder with depressed mood.  (Tr. 527.)  Dr. Olson referred Plaintiff to "ADS" (Adult Day Services) for intake scheduled on December 31, 2008.  (*Id.*)

The next day, December 19, 2008, after Plaintiff had asked for assistance regarding food stamps and housing, social worker Molly Matteson sent him a

A-9

letter with information about Ramsey County Food Support and Veterans Community Housing.  (Tr. 493–94.)  She was unable to contact him via telephone.  (Tr. 493.)  She encouraged Plaintiff to contact his County Veteran Service Officer, Steven Lindstrom, to see what other services and assistance were available.  (Tr. 494.)

On December 29, 2008, Dr. Ali Mokhtarzadeh saw Plaintiff as a walk-in patient at HCMC.  (Tr. 426–31.)  Plaintiff complained of a cough and sore throat, which had lasted one week, and constant back and neck pain since 1978. (Tr. 426–28.)  Plaintiff stated that he was dissatisfied with his primary care at the Minneapolis VAMC and wanted to establish care with HCMC.  (Tr. 428.) Dr. Mokhtarzadeh gave Plaintiff Robitussin DM for his cough told him to follow up in four weeks and bring his records from the VAMC to establish primary care. (Tr. 248, 430.)

Plaintiff saw Dr. Mariner for a follow-up visit at the Minneapolis VAMC on January 6, 2009.  (Tr. 518–22.)  He reported that his mood had improved and he felt more relaxed.  (Tr. 518.)  Dr. Mariner noted that Plaintiff had "much improved control" of his hypertension and he was back on his medications.  (Tr. 521.) Dr. Mariner continued Plaintiff's pain medications for his osteoarthritis, degenerative disc disease, and mild stenosis.  (*Id.*)  He also discussed with Plaintiff at length the risks of continuing smoking and the importance of quitting. (Tr. 521–22.)

On January 9, 2009, Plaintiff had a mental health intake appointment with Dr. Taimur R. Malik at the Minneapolis VAMC.  (Tr. 515–16.)  Dr. Malik noted that Plaintiff had multiple stressors – he was unemployed, living in his daughter's house, separated from his wife, under financial pressure, and in the process of applying for social security and disability benefits.  (Tr. 515.)  At that time, Plaintiff expressed some feelings of helplessness and stated that he sometimes had low mood and loss of interest.  (*Id.*)  He also stated that he had difficulty staying asleep and only a medium appetite that he sometimes could not maintain.  (*Id.*)  He denied having suicidal or homicidal thoughts or plans, and he rated his self-esteem as medium.  (*Id.*)  He told Dr. Malik that he last used cocaine on October 31, 2008, and had not used marijuana since before then.  (Tr. 516.)  Plaintiff also told Dr. Malik that he would have two brandy drinks and two beers every other weekend, although he had told a nurse earlier that day that he drank once a week on the weekend and would have "three beers and half a pint." (Tr. 516–17.)  Dr. Malik assessed that Plaintiff's symptoms of depression, which had lasted about a week, were related to his stressors.  (Tr. 516.)  Plaintiff agreed to join a psychiatric partial hospitalization ("PPH") program,[7]  and

---

[7]    The Minneapolis VAMC's PPH program offers veterans three weeks of outpatient treatment for a variety of mental health issues such as suicide, depression, posttraumatic stress disorder and substance abuse.  *See* http://www.minneapolis.va.gov/MINNEAPOLIS/services/recreation_therapy/PPH. asp.

Dr. Malik noted that he believed Plaintiff would benefit from PPH's therapy and programming, especially for his drug use issue.  (*Id.*)

Clinical social worker Thomas Kundla also met with Plaintiff on January 9, 2009.  (Tr. 509–15.)  Plaintiff told him that he cancelled the intake Dr. Olson previously scheduled because of the early hour.  (Tr. 510.)  Also, Plaintiff stated that because he had no concerns with drug or alcohol abuse or dependency, he felt that Dr. Olson had mistakenly referred him.  (*Id.*)  Mr. Kundla noted, however, that Plaintiff had a history of alcohol use and abuse and that Plaintiff was in treatment before 1990.  (*Id.*)  Plaintiff then told Mr. Kundla that he would be honest and he admitted that he infrequently smoked marijuana and crack cocaine.  (*Id.*)  During this visit, he described his neck pain as "throbbing" and "aching" and rated it at a seven.  (Tr. 513.)

Plaintiff also told Mr. Kundla that he was depressed, particularly during the last year, and that he would work if he could, especially since he made good money before, but this was no longer possible due to his physical situation. (Tr. 510.)  He stated that he felt depressed more often than not, and he discussed a feeling of worthlessness, telling Mr. Kundla, "I'm just existing." (Tr. 511.)  He reported thinking about death more and having "passive" suicidal thoughts, but he did not have plans to hurt himself.  (Tr. 511, 514.)  Plaintiff denied any violent behavior, although he had a legal history of assault in the 1980s.  (Tr. 511.)  He stated that he was drinking less than he was three weeks prior and that he was not worried about his drinking.  (*Id.*)  He told Mr. Kundla

that he had used marijuana and cocaine in the past, beginning with cocaine after his mother died, and he used hallucinogens in the 1970s.  (*Id.*)  He explained that he was a patient for six months in 1989 in a community-based drug and alcohol treatment program, and that he had most recently used crack cocaine on October 31, 2008, and last used marijuana during the summer of 2008.  (*Id.*)  Mr. Kundla wrote in his report, however, that a urine screen indicated "Yes."  (*Id.*)  Ultimately, Mr. Kundla and Plaintiff agreed on a treatment plan, including a referral to the PPH program.  (Tr. 514.)

Plaintiff met with Dr. Marianne M. Schumacher for a mental health consultation at the Minneapolis VAMC on January 13, 2009.  (Tr. 491–92.)  His concerns at that time included "feelings of low mood, occasional sleeplessness, and feelings of helplessness" due to several stressors in his life.  (Tr. 491.)  His primary goal was to obtain social security benefits to help get his finances under control and live independently.  (*Id.*)  Plaintiff denied any "significant substance use problems."  (Tr. 492.)  But Dr. Schumacher noted that Plaintiff's records showed a history of polysubstance disorder, and that it was unclear whether Plaintiff was using any substances at the time.  (Tr. 491.)  Dr. Schumacher diagnosed Plaintiff as having "Adjustment disorder with depressed mood vs. Depression, NOS."  (Tr. 492.)  She stated that he had low mood and psychiatric symptoms, but he was not having a severe psychiatric episode and was not at risk for hospitalization.  (*Id.*)  Dr. Schumacher also stated that Plaintiff had not failed outpatient psychotherapy because he had not yet followed up with the plan

to attend ADS services and he had cancelled his intake on December 31, 2008.
(*Id.*)  She wrote that Plaintiff would likely benefit from an outpatient team that
could provide case management services, such as offering support, providing
information and education on coping strategies, and helping him maintain his
efforts to stay clean from drugs.  (*Id.*)

On January 14, 2009, Plaintiff visited the Minneapolis VAMC's General
Medicine Clinic for a follow-up visit with Dr. Mariner regarding his degenerative
disc disease, osteoarthritis, and chronic joint pain.  (Tr. 503–08.)   Plaintiff told
Dr. Mariner that he was frustrated because he was trying to get disability and VA
assistance for his back pain.  (Tr. 504.)  Dr. Mariner noted that Plaintiff's
hypertension was well controlled by medications but reemphasized and
discussed with Plaintiff the need to quit smoking.  (Tr. 507.)  Because Vicodin
was making Plaintiff itch, Dr. Mariner put him on a trial of Tylenol with codeine to
help with his chronic back pain.  (Tr. 504, 507.)  Plaintiff was to visit Dr. Mariner
again in July 2009.  (Tr. 507.)

Plaintiff had an office visit with Dr. Muhammad A. Ali at HCMC on
January 20, 2009, for his back pain and to establish primary care.  (Tr. 442–48.)
At that time, Plaintiff reported that his back pain was worse when sitting,
standing, and walking, and that he could somewhat abate the pain by lying down
with his knees bent.  (Tr. 444.)  He added that the pain radiated to the back of his
right leg up to the right knee and bilaterally to his hips.  (*Id.*)  He stated that he
had been on his pain medications but that they were mostly ineffective.  (*Id.*)  He

A-14

mentioned getting minimal relief from Naproxen, so he used it only occasionally. (*Id.*)  Dr. Ali, along with Dr. Melody Mendiola, opined that Plaintiff should continue receiving treatment at the VAMC because it had all of Plaintiff's medical records and because the doctors had been trying appropriate medical therapy to treat his back pain.  (Tr. 447–48.)

On March 25, 2009, Plaintiff met with Dr. Fazendin at the Minneapolis VAMC's Rehab Medicine Clinic.  (Tr. 500–03.)  Dr. Fazendin had referred Plaintiff to physical therapy at their last meeting, but Plaintiff only went to three sessions and then stopped attending.  (Tr. 500.)  Plaintiff was not following a home exercise program, except for lying in bed on his back and moving his pelvis around and sometimes walking six to seven blocks.  (*Id.*)  Plaintiff reported that his back hurt from his neck to lower back, with aching in the low back and across his waist, but no pain radiating to his legs.  (*Id.*)  He rated his pain at an eight out of ten.  (*Id.*)  Plaintiff stated that any activity made his back pain worse, but taking Percocet helped.  (*Id.*)  He told Dr. Fazendin he was taking four Percocet each day, which was more than prescribed.  (*Id.*)  Plaintiff also stated that he had recently separated from his wife and was living with his daughter, his mood was very low, and he was frustrated with his living situation and lack of money.  (*Id.*)  He also had trouble falling asleep.  (*Id.*)  In addition, Plaintiff was smoking one-half to one full pack of cigarettes daily, but he stated that he was not drinking alcohol or using drugs and he denied ever receiving alcohol or drug treatment.  (Tr. 501.)

Upon examination, Dr. Fazendin found that Plaintiff could flex his lumbar spine 40 degrees and extend 10 degrees.  (*Id.*)  She stated that Plaintiff gave an exaggerated pain response to light palpitation along his entire cervical and lumbar spine, but she noted that he did have mild paravertebral tenderness and mild sacroiliac tenderness.  (*Id.*)  Dr. Fazendin also reviewed Plaintiff's lumbar and cervical spine MRIs from July 2007.  (Tr. 502.)  Her impression of the lumbar MRI was that Plaintiff had irritation of the left S1 nerve root related to some disk abnormality at L5-S1 and that facet hypertrophy and disk bulge at L3-4 may have been contributing to lateral recess stenosis.  (*Id.*)  She found no significant discogenic disease on the cervical MRI but noted that there was occasional mild effacement of Plaintiff's anterior cerebrospinal fluid and occasional neroforaminal stenosis.  (*Id.*)  She also indicated that Plaintiff's right lobe thyroid may have been enlarged.  (*Id.*)

Dr. Fazendin told Plaintiff that he likely would always have some back pain but that she would try to make him more functional.  (Tr. 502.)  She stated that his best option was an active rehab program, including physical therapy and daily exercise.  (*Id.*)  These activities would improve Plaintiff's range of motion and function and increase his strength.  (*Id.*)  Plaintiff was frustrated by these suggestions and indicated that he was not interested in physical therapy.  (*Id.*)  However, he agreed to take a handout on back basics, and Dr. Fazendin showed him some exercises he could do.  (*Id.*)  She also wrote a physical therapy consult for him to get a TENS unit that would help with pain management, and she

recommended using heat and ice, as well as activity modification, to manage flares.  (*Id.*)  Dr. Fazendin did not recommend any additional medications and discussed with Plaintiff the importance of treating his depression and insomnia. (*Id.*)  She concluded that she had nothing further to offer Plaintiff because he had no interest in an active rehab program.  (*Id.*)

On March 25, 2009, Dr. Mariner completed another Hennepin County request for a medical opinion form.  (Tr. 465.)  He diagnosed Plaintiff with degenerative disc disease and osteoarthritis and indicated that it was "unknown" how long those conditions would last.  (*Id.*)  For the question asking whether Plaintiff would be able to perform employment, Dr. Mariner marked "N/A."  (*Id.*)  A note at the end of that question stated, "Please list a length of time or reevaluation date," and the date "7/13/09" is written next to it.  (*Id.*)

On April 9, 2009, Plaintiff saw Dr. Michael Wengler at the Tria Orthopaedic Center for his low back pain and some right anterior thigh pain.  (Tr. 475–77.) Upon physical exam, Dr. Wengler found that Plaintiff had mildly limited extension "at approximately 10 degrees due to pain," although he flexed to 50 degrees. (Tr. 475.)  Dr. Wengler reviewed x-rays of Plaintiff's lumbar spine, which he states revealed degenerative disk disease primarily at L5-S1 with some facet arthrosis in the same location.  (Tr. 475, 477.)  Dr. Wengler ordered L5-S1 facet injections to provide temporary symptomatic relief.  (Tr. 476.)

On April 15, 2009, and at Dr. Wengler's referral, Plaintiff had an exam at the Center for Diagnostic Imaging in St. Louis Park, Minnesota.  (Tr. 538.)

During this exam, Plaintiff had a therapeutic injection of steroid and local anesthetic into his left L5-S1 facet joint to treat his bilateral low back pain.  (*Id.*) Dr. Sharad Chopra concluded that twenty minutes after the exam, Plaintiff had fifty percent overall symptomatic relief.  (*Id.*)

Thereafter, Dr. David Griffin of the Minneapolis VAMC saw Plaintiff for the first time on April 22, 2009.  (Tr. 498–99.)  Plaintiff told him that he was unemployable and complained of chronic lower back pain.  (Tr. 498.)  He told Dr. Griffin that his back pain was a service-connected condition and that his application for benefits was rejected after a compensation and pension exam in January 2008.  (*Id.*)  He stated that he was appealing the rejection and that his only income was from general assistance.  (*Id.*)  Dr. Griffin noted that Plaintiff had not been compliant with his physical therapy and had not gotten a TENS unit. (*Id.*)  He also stated that he would rather see Plaintiff engaged in physical therapy than taking narcotics, which Plaintiff was taking twice daily.  (*Id.*) Dr. Griffin noted that he thought Plaintiff wanted him to declare Plaintiff unemployable, but he stated he would leave the disability evaluation to others. (*Id.*)  Dr. Griffin planned to check Plaintiff's uric acid levels and assess his monthly gout attacks, and he increased Plaintiff's Lisinopril intake for hypertension.  (Tr. 499.)

On August 19, 2009, Dr. Griffin saw Plaintiff again at the Minneapolis VAMC to complete a disability form from Hennepin County and examine his cough, which had apparently lasted for two months, and numbness in toes on his

left foot.  (Tr. 496–97.)  Dr. Griffin found no apparent cause for Plaintiff's cough

but gave him antibiotics.  (Tr. 496.)  He assessed that Plaintiff's toe numbness

might be due to compression neuropathy around his metatarsophalangeal joints

and recommended that Plaintiff use shoe inserts and a pumice stone.  (Tr. 496–

97.)  On the disability form, Dr. Griffin noted that Plaintiff had not followed the

treatment plan recommended in March and that Plaintiff was able to perform

limited employment if he avoided heavy lifting.  (Tr. 464, 496.)  Dr. Griffin

diagnosed Plaintiff with "chronic mechanical low back pain" and a permanent

medical limitation.  (Tr. 464.)

On August 28, 2009, Plaintiff had another injection at the St. Louis Park

Center for Diagnostic Imaging.  (Tr. 537.)  Dr. Marshall Golden indicated that

after the injection Plaintiff responded with fifty percent improvement in thigh pain

and no change in back pain.  (*Id.*)

A little over a week later, Plaintiff went to the HCMC emergency

department for a cough that he stated had persisted for more than a month.

(Tr. 452–57.)  Plaintiff reported that the cough became worse when he would lie

down and that he could not lie flat.  (Tr. 452.)  Dr. Heidi F. Walz diagnosed

Plaintiff with bronchitis.  (Tr. 454–55.)  She counseled him on quitting smoking

and gave him "Tessalon Pearls"[8] and Sudafed.  (Tr. 455.)  Medical student Nicole

R. Smith instructed Plaintiff upon his discharge that the best thing he could do

---

[8]     The proper spelling is Tessalon Perles, which is a medication used for
relieving coughs.  *See* http://www.medicinenet.com/benzonatate/article.htm.

was to quit smoking.  (Tr. 460.)  She also told him that he could treat his cough

symptomatically but that he needed to follow up with his primary care provider.

(*Id.*)

      Plaintiff returned to the Tria Orthopaedic Center on September 17, 2009, to

see Dr. Wengler.  (Tr. 473.)  Plaintiff reported that his back pain worsened for

several days after receiving a corticosteroid injection, but eventually became

slightly better than before the injections.  (*Id.*)  After examining Plaintiff,

Dr. Wengler's impression was that Plaintiff had degenerative disc disease at disk

L5-S1.  (*Id.*)  He noted that Plaintiff had limited mobility, "particularly in extension

and right and left lateral bending."  (*Id.*)  Dr. Wengler stated that Plaintiff would

have to continue treating symptoms until he can no longer get through his daily

living activities, and at that point they would have to consider spine fusion.  (*Id.*)

Dr. Wengler also noted that Plaintiff "would have a difficult time doing any type of

manual labor; even sedentary work would be quite painful because of the facet

arthropathy at L5-S1."  (*Id.*)

      Plaintiff saw Dr. Wengler at Tria Orthopaedic Center again on

September 21, 2009, for his low back pain.  (Tr. 474.)  Plaintiff reported that he

had several months of "good relief" after receiving facet injections, and he

requested more.  (*Id.*)  He stated that his pain sometimes reached an eight out of

ten, but he denied any radiating pain, numbness, or weakness.  (*Id.*)

Dr. Wengler's examination revealed degenerative disc disease at L5-S1, but

Plaintiff's lumbar spine had "a normal lordosis without erythema, ecchymosis, or

edema." (*Id.*)  Dr. Wengler ordered facet-joint and nerve injections on both sides of Plaintiff's L5-S1 disk.  (*Id.*)  That same day, Dr. Wengler completed a Hennepin County-requested medical opinion form in which he diagnosed Plaintiff with degenerative disc disease at his L5-S1 disc and facet arthropathy.  (Tr. 463.) He indicated that Plaintiff had permanent physical or mental limitations with standing, lifting, sitting, bending, and squatting.  (*Id.*)  Dr. Wengler also noted that he had prescribed a treatment plan and that Plaintiff had been following it.  (*Id.*)

On October 19, 2009, Dr. Griffin wrote Plaintiff's lawyer a letter in response to a disability form request.  (Tr. 535–36.)  In this letter, Dr. Griffin acknowledged that he had seen Plaintiff twice but stated that he was "not able to render any opinion regarding [Plaintiff's] ability to work."  (Tr. 535.)  He stated that Plaintiff had chronic lower back pain since the 1970s and suggested that the lawyer consult Plaintiff's medical records, including Dr. Fazendin's evaluation on March 25, 2009.  (*Id.*)